# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOHNNIE FLOURNOY,        ) | |
|                   ) | |
|        Plaintiff,       ) | |
|                   ) | |
| vs.                   ) | Case No. 3:22-CV-49-MAB |
|                   ) | |
| DEEDEE BROOKHART,       ) | |
| LAURA CUNNINGHAM,      ) | |
| AMBER ELLIOT, and        ) | |
| WEXFORD HEALTH SOURCES, INC.,   ) | |
|                   ) | |
|        Defendants.     ) | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is currently before the Court on the motion for counsel filed by Plaintiff Johnnie Flournoy (Doc. 37), and the motions for summary judgment on the issue of exhaustion filed by all Defendants (Docs. 35, 41; *see also* Docs. 36, 42). For the reasons explained below, Plaintiff's motion for counsel (Doc. 37) is denied; the motions for summary judgment (Docs. 35, 41) are granted.

## BACKGROUND

In December 2020, Plaintiff Johnnie Flournoy, an inmate in the custody of the Illinois Department of Corrections, filed a lawsuit pursuant to 42 U.S.C. § 1983 alleging deprivations of his constitutional rights at Lawrence Correctional Center. *Flournoy v. Brookhart, et al.*, SDIL Case No. 20-cv-01357-SPM, Doc. 1. Plaintiff's allegations and claims regarding COVID-19 were severed into the instant lawsuit on January 11, 2022 (Doc. 1). *See also* SDIL Case No. 20-cv-01357-SPM, Doc. 11. Specifically, he alleged proper COVID-

19 protocols were not implemented at Lawrence and he was not provided with any medical treatment when he contracted the virus in November 2020 (Doc. 1). Following a threshold review of Plaintiff's allegations pursuant to 28 U.S.C. § 1915A, Plaintiff was permitted to proceed on the following claims:

**Count 6**: Eighth Amendment claim against Brookhart, Elliott, and Cunningham for failing to implement proper COVID-19 safety protocols.

**Count 7**: Eighth Amendment claim against Brookhart, Cunningham, and Wexford for failing to provide medical treatment to Plaintiff once he contracted COVID-19.

**Count 9**: First Amendment claim against Elliott for moving Plaintiff to different cells in retaliation for filing grievances and complaints.

Wexford filed its motion for summary judgment on the issue of exhaustion on June 5, 2023 (Docs. 35, 36). The following day, Plaintiff filed a motion asking the Court to recruit counsel for him due to his vision impairment (Doc. 37). Plaintiff indicated that he is completely blind in his left eye and has only partial vision in his right eye, which was worsening by the day (Doc. 37). Plaintiff, however, was able to file a response in opposition to Wexford's motion for summary judgment (Doc. 38).

Defendants Brookhart, Cunningham, and Elliot filed their motion for summary judgment on the issue of exhaustion on August 7, 2023 (Docs. 41, 42). Two weeks later, Plaintiff filed his response in opposition (Doc. 44). Based on the contents of Plaintiff's response, Wexford filed a reply brief in support of its own motion for summary judgment (Doc. 45), to which Plaintiff filed a sur-reply (Doc. 47).[1]

---

[1] Under this Court's Local Rules, sur-reply briefs are prohibited. See SDIL-LR 7.1(a)(4) ("Under no circumstances will sur-reply briefs be accepted.")

### MOTION FOR COUNSEL

"There is no right to court-appointed counsel in federal civil litigation." *Giles v. Godinez*, 914 F.3d 1040, 1052 (7th Cir. 2019) (quoting *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014)). But the district court has discretion to recruit an attorney for any litigant who cannot otherwise afford one. *Giles*, 914 F.3d at 1052. A district court considering an indigent plaintiff's request for counsel must first consider whether the plaintiff has made reasonable attempts to secure counsel on his own or been effectively precluded from doing so; and, if so, whether the difficulty of the case factually and legally exceeds his capacity as a layperson to present it. *Pruitt v. Mote*, 503 F.3d 647, 654–55 (7th Cir. 2007).

Here, Plaintiff did not provide sufficient information to allow the Court to determine whether he is indigent. He paid the filing fee in full and did not request to proceed *in forma pauperis* ("IFP"). While his motion for counsel includes a trust fund statement, it is only for the two-and-a-half-month period preceding the motion (*see* Doc. 37, pp. 7–9). The Court does not believe that this limited snapshot of Plaintiff's trust fund activity is sufficient to establish indigency. *See* 28 U.S.C. § 1915(a)(1), (2) (requiring a prisoner who wants to proceed IFP to submit an affidavit attesting to all of their assets and a certified copy of the trust fund account statement for the *six-month* period immediately preceding the filing of the complaint).

Additionally, Plaintiff simply did not provide enough information to allow the Court to determine whether he made a reasonable attempt to obtain counsel on his own. Plaintiff was previously told that in order to make this showing, he had to contact at least three attorneys regarding representation in *this* case and provide the Court with the

attorneys' names and addresses, an explanation as to how and when he attempted to contact them, and the attorneys' responses (if any) (Doc. 33). Plaintiff stated in his motion that he contacted the NAACP and three other attorneys: Ben Crump, "Attorney Gerstein out of the Central District of Illinois," and "Mr. Muslin" from Muslin & Sandberg (*see* Doc. 37, p. 1). He never heard back from the NAACP or Mr. Crump (*Id.*). Mr. Gerstein is now retired (*Id.*). And Mr. Muslin stopped communicating with Plaintiff due to extenuating circumstances in his personal life (*Id.*). Plaintiff also submitted "rejection" letters from the ACLU and the firm Loevy & Loevy (*Id.* at pp. 3–5).

At first blush, it looks like Plaintiff did enough to satisfy his burden. However, after a more careful evaluation, the Court is not convinced. To begin with, the Court questions whether Plaintiff was actually seeking representation *for this case* when he wrote to the ACLU and Loevy & Loevy. The first letter from the ACLU and the rejection letter from Loevy & Loevy are respectively dated eight and nine months prior to Plaintiff's motion for counsel,[2] and they were both previously submitted with Plaintiff's request for counsel in his other case (*see* SDIL Case No. 20-cv-01357-SPM, Doc. 39, pp. 28, 29). Additionally, the first letter from the ACLU merely thanks Plaintiff for sending documents "about the *Lippert* class action lawsuit," which pertains to inadequate medical care in the IDOC; it says nothing about a request for representation in a case regarding the facility's handling of COVID-19 (Doc. 37, p. 4). While the second letter from the ACLU

---

[2] The rejection letter from Loevy & Loevy is dated September 7, 2022 (Doc. 37, p. 3). The first rejection letter from the ACLU is dated October 10, 2022, while the second is dated May 3, 2023 (*Id.* at pp. 4, 5). Plaintiff filed his motion for counsel on June 6, 2023 (Doc. 37)

makes clear that Plaintiff requested representation, it once again mentions efforts "to improve healthcare in IDOC via the *Lippert* class action," which suggests to the Court that Plaintiff was seeking representation in his first case regarding inadequate medical care, not the manner in which Lawrence handled COVID. At any rate, the ACLU told Plaintiff that it focuses on "broad impact, constitutional litigation" and rarely involves itself in "cases of individual unfairness or injustice" (*Id.* at p. 5).

The Court believes the NAACP operates in much the same way as the ACLU and has never seen the NAACP accept a solicitation to represent an individual prisoner in a civil rights case. The Court also questions whether Attorney Ben Crump was a truly realistic option given that he is a nationally renowned attorney, best known for taking on high-profile cases. And, of course, Mr. Gerstein was not a viable option given that he had retired. Contacting organizations and/or attorneys who are almost certainly not going to accept his case due to the nature and scope of their work—or the fact that they are no longer working at all—does not constitute a reasonable attempt to obtain counsel. Furthermore, Plaintiff did not indicate when he wrote to the NAACP and Attorneys Crump and Muslin, nor did he verify that he requested representation in this particular case. Absent this information, the Court is unable to say that Plaintiff made a reasonable attempt to recruit an attorney for himself.

Finally, at the time of Plaintiff's request for counsel, this case was in the exhaustion stage. Plaintiff's responses to Defendants' motions for summary judgment demonstrate that he had all the necessary facts at his disposal and was capable of explaining his efforts to exhaust his administrative remedies without the assistance of counsel and in spite of

his visual impairment.

For all of these reasons, Plaintiff's motion for counsel is denied.

### MOTIONS FOR SUMMARY JUDGMENT ON THE ISSUE OF EXHAUSTION

In their motions for summary judgment, Defendants argue there are only two grievances relevant to Plaintiff's claims—one written in August 2020 and the other in December 2020—but Plaintiff prematurely filed this lawsuit *before* he fully exhausted either grievance (Doc. 36, pp. 2–3, 8; Doc. 42, pp. 2–3, 6-7). Defendants also argue that the December 2020 grievance is insufficient to exhaust Plaintiff's claims because it was rejected due to a procedural defect (Doc. 36, p. 7; Doc. 42, pp. 7–8).

Plaintiff responded with a laundry list of arguments (Doc. 38; Doc. 44). He argued, in short, that he should be deemed to have fully exhausted his administrative remedies because he complied with "the Spirit and Intent of the PLRA" and "730 ILCS [5/3-8-8]" and the grievance process was rendered unavailable for various reasons (Doc. 38; Doc. 44).

### Background

### 1.  The Allegations in the Complaint

The claims proceeding in this case encompass the following allegations.[3] During the pandemic, Placement Officer Supervisor Amber Elliott recklessly moved inmates all

---

[3] The Court notes Plaintiff alleged that after the COVID-19 pandemic hit in March 2020, Lawrence continued to run lines with hundreds of inmates to chow, yard, the gym, and school programs, and Warden DeeDee Brookhart denied emergency grievances complaining about it (Doc. 12, p. 2; *see also* SDIL Case No. 20-cv-1357, Doc. 1, p. 5 (original complaint); Doc. 10, p. 7 (first amended complaint). This allegation, however, appears to be background information rather than an integral part of Plaintiff's claims. The original and first amended complaint both highlight that cell transfers are the issue at the heart of Plaintiff's

over the prison (Doc. 12, pp. 2–3; Doc. 2, pp. 7–8, 15–16). Warden Brookhart and Health Care Administrator Laura Cunningham were aware of Elliott's actions and numerous inmate complaints over it, but they did nothing to stop it and signed off on her conduct once a grievance was filed (Doc. 12, pp. 2–3; Doc. 2, pp. 7–8, 15–16). Plaintiff alleges that he had a single-man cell, but then Elliot began moving him from cell to cell, for no apparent reason (Doc. 12, pp. 2–3; Doc. 2, pp. 7–8, 15–16). Eventually, she moved him into cells with other inmates who did not wear masks (Doc. 12, pp. 2–3; Doc. 2, pp. 7–8, 15–16). Plaintiff believes all of the moves were in retaliation for filing grievances and complaints (Doc. 12, pp. 2–3; Doc. 2, pp. 7–8, 15–16).

Plaintiff contracted COVID-19 in November 2020 and was moved to a cell house with other infected inmates (Doc. 12, pp. 2–3; Doc. 2, pp. 7–8, 15–16). He alleges that he was extremely ill but did not receive any medical treatment because Brookhart, Cunningham, and Wexford were enforcing Wexford's "cost cutting policy." (Doc. 12, pp. 2–3; Doc. 2, pp. 7–8, 15–16).

## B. Plaintiff's Grievances

Defendants submitted grievance records pertaining to the following two grievances, which are discussed in chronological order.

First, the IDOC Defendants pointed to Grievance #08-20-156, dated August 7, 2020 (Doc. 42-1, pp. 11–14). In this grievance, Plaintiff complained about a number of cell moves, that began "a few months ago" and continued up to the date of his grievance.

---

claims. *See* SDIL Case No. 20-cv-1357, Doc. 1, pp. 8–9 (original complaint); Doc. 10, pp. 7–8, 15 (first amended complaint). S.

Plaintiff indicated that he felt like he was being targeted and the moves were in total disregard of the fact that he is blind and vulnerable to the coronavirus. This grievance was stamped "received" by the facility on August 14, 2020, and Plaintiff's counselor responded on August 18th. The grievance officer then received the grievance a week later and responded on October 8th, recommending that the grievance be denied. The Warden concurred and denied the grievance on October 13th. Plaintiff appealed to the ARB, where the grievance was received on October 30, 2020.[4] The ARB responded to the grievance on March 11, 2021, and denied it. However, Plaintiff had already filed his complaint and initiated case no. 20-cv-1357-SPM on December 22, 2020, almost three months before the ARB responded.

Second, the IDOC Defendants and Wexford both pointed to Grievance #12-20-359, dated December 7, 2020 (Doc. 36-1, pp. 21–24; Doc. 42-1, pp. 7–10). In this grievance, Plaintiff complained that there were no precautions taken to protect the inmates at Lawrence from COVID-19 and he contracted the virus. He indicated that he was extremely sick, and no medical care was provided. Plaintiff's counselor received the grievance on December 16, 2020. Six days later, and before the counselor had responded, Plaintiff filed his complaint and initiated case no. 20-cv-1357-SPM. The counselor then responded on January 5, 2021. The grievance officer received Grievance #12-20-359 on

---

[4] Plaintiff submitted evidence that, around the same time he appealed to the ARB, he also sent a copy of the grievance to the Governor along with a letter dated October 29, 2020 (*see* Doc. 44, pp. 15–21). The Governor's office forwarded everything to the ARB, and the ARB received it on February 2, 2021 (*see id.*). Two days later, the ARB sent a communication to Plaintiff informing him, in pertinent part, that grievance #08-20-156 had been forwarded to them by the Governor's office, it was the second time they had received that grievance, and they would mail him a response after the grievance was reviewed (*Id.* at p. 15).

January 28, 2021, and responded on May 7, 2021, recommending that the grievance not be reviewed because it did not contain an incident date as required by the administrative rules. The Warden concurred and rejected the grievance on what appears to be May 7, 2021 (the date is difficult to read). Plaintiff appealed to the ARB on May 14th and the ARB received his appeal on May. Three days later, the ARB returned the grievance to Plaintiff without review because it did not contain a date for the incident and thus failed to comply with the administrative rules.

In his response, Plaintiff argues that he complied with "the Spirit and Intent of the PLRA" and "730 ILCS [5/3-8-8]" and therefore exhausted all his available remedies (Doc. 38, pp. 1, 6; Doc. 44, pp. 1, 2). More specifically, he argues that the December grievance provided officials with enough information to understand his issue and respond to it, and therefore he had done all that was required to satisfy the spirit and intent of the PLRA (Doc. 38, p. 6; Doc. 44, pp. 3, 4). He also argues that officials' refusal to address the December grievance violates 730 ILCS 5/3-8-8, which provides that a committed person's right to file grievances shall not be restricted (Doc. 38, p. 6; *see also* Doc. 44, p. 4). As further evidence of his compliance with the spirit and intent of the PLRA and 730 ILCS 5/3-8-8, Plaintiff pointed to a number of "formal complaints" that he submitted to the Governor of Illinois between January 2018 and January 2022, many of which were also sent to the Department of Justice and/or the Director of the IDOC, and to other grievances that he wrote in 2020, 2021, and 2022 on his own behalf and on behalf of other inmates (Doc. 38, pp. 17, 18–19, 25–61; Doc. 44, pp. 1–2, 7–35, 36–37). He claimed that he submitted grievances and appeals that went unanswered and that a counselor told him, "things

were shut down because of Covid" (Doc. 44, pp. 3, 4, 37; *see also* Doc. 38, p. 6). Finally, he

stated that "[m]edical conditions interfered with him doing more" (Doc. 44, p. 3).[5]

## <u>Legal Standard</u>

Summary judgment is proper only if the movant shows that there is no genuine

issue as to any material fact and they are entitled to judgment as a matter of law. FED. R.

CIV. P. 56(a). In making that determination, the court must view the evidence in the light

most favorable to, and draw all reasonable inferences in favor of, the nonmoving party.

*Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

Courts generally cannot resolve factual disputes on a motion for summary judgment.

*E.g., Tolan v. Cotton*, 572 U.S. 650, 656, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014) ("[A]

judge's function at summary judgment is not to weigh the evidence and determine the

truth of the matter but to determine whether there is a genuine issue for trial.") (internal

quotation marks and citation omitted). However, when the motion for summary

judgment pertains to a prisoner's failure to exhaust, the Seventh Circuit has instructed

courts to conduct an evidentiary hearing and resolve contested issues of fact regarding a

prisoner's efforts to exhaust. *Wagoner v. Lemmon*, 778 F.3d 586, 590 (7th Cir. 2015) (citing

*Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008)). *Accord Roberts v. Neal*, 745 F.3d 232, 234 (7th

Cir. 2014). But when there are no material factual disputes, an evidentiary hearing is not

necessary. *See Doss v. Gilkey*, 649 F. Supp. 2d 905, 912 (S.D. Ill. 2009) (no hearing required

---

[5] Plaintiff wrote that, "When [he] caught the coronavirus, he almost died and received no medical treatment so he hurried and filed this lawsuit with a copy going to his family should he die to take to a lawyer to pursue. Medical conditions interfered with him doing more." (Doc. 44, p. 3).

where there are "no disputed facts regarding exhaustion, only a legal question"). Here, there are no material issues of fact that require a hearing to resolve.

The Prison Litigation Reform Act provides that a prisoner may not bring a lawsuit about prison conditions unless and until he has exhausted all available administrative remedies. 42 U.S.C. § 1997e(a); *Pavey v. Conley*, 663 F.3d 899, 903 (7th Cir. 2011). Exhaustion is an affirmative defense, which the defendants bear the burden of proving. *Pavey*, 663 F.3d at 903 (citations omitted). In order for a prisoner to properly exhaust his or her administrative remedies, the prisoner must "file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002); *see also Woodford v. Ngo*, 548 U.S. 81, 90 (2006). Failure to do so means failure to exhaust. *Riccardo v. Rausch*, 375 F.3d 521, 524 (7th Cir. 2004). However, an inmate is required to exhaust only those administrative remedies that are available to him. *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016); *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). Administrative remedies become "unavailable" when, for example, prison officials fail to respond to a properly filed inmate grievance or thwart a prisoner from exhausting. *Pyles*, 829 F.3d at 864; *Lewis v. Washington,* 300 F.3d 829, 833 (7th Cir. 2002); *Dole*, 438 F.3d at 809**.**

As an inmate in the IDOC, Plaintiff was required to follow the three-step grievance process outlined in the Illinois Administrative Code to exhaust his claims. 20 ILL. ADMIN. CODE § 504.800, *et seq*. (2017). The regulations require an inmate to first submit the grievance within 60 days of the incident, occurrence, or problem. *Id.* at § 504.810(a). After the counselor responds, the grievance goes to the grievance officer, who tenders a

recommendation to the warden within two months after receipt of the written grievance, "when reasonably feasible under the circumstances." *Id.* at § 504.830(e). The warden then reviews the recommendation and provides the inmate with a written decision on the grievance. *Id.* If the inmate is unsatisfied with the warden's decision, he has thirty days from the date of the warden's decision to appeal to the Administrative Review Board ("ARB"). *Id.* at § 504.850(a). The ARB submits a written report of its findings and recommendations to the Director of the IDOC, who then makes a final decision, which should be issued "within six months after receipt of the appealed grievance, when reasonably feasible under the circumstances." *Id.* at § 504.850(d), (e).

## <u>Discussion</u>

Defendants have shown, and Plaintiff does not dispute, that there are only two grievances that went through every step of the grievance process and pertain to the issues in this lawsuit: the August 7, 2020 grievance and the December 7, 2020 grievance. The Court agrees with Defendants that Plaintiff filed suit prematurely before either of these grievances was fully exhausted.

The PLRA is clear: a prisoner must exhaust their claims *before* filing suit. 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions . . . by a prisoner . . . until such administrative remedies as are available are exhausted."). *See also Woodford v. Ngo,* 548 U.S. 81, 88, 93 (2006) (holding that "complet[ing] the administrative review process" is "a precondition to [a prisoner] bringing suit in federal court"); *Ford v. Johnson*, 362 F.3d 395, 398 (7th Cir. 2004) ("[E]xhaustion must precede litigation."). Federal courts strictly enforce this requirement. *Hernandez v. Dart*, 814 F.3d 836, 842 (7th Cir. 2016). If the

prisoner files his lawsuit before his administrative remedies are fully exhausted, the lawsuit must be dismissed, even if the prisoner anticipates they will soon be exhausted, or they are exhausted during the pendency of the lawsuit. *Hernandez*, 814 F.3d at 841–42; *Ford*, 362 F.3d at 398.

Plaintiff appealed the August 2020 grievance to the ARB on October 19, 2020, and the ARB received it on October 30, 2020 (*see* Doc. 42-1, pp. 11, 12). According to the Illinois Administrative Code, the Director of the IDOC is supposed to issue his final decision "within six months after receipt of the appealed grievance, when reasonably feasible under the circumstances." 20 ILL. ADMIN. CODE 504.850(e). But Plaintiff gave the Director less than two months before he filed suit on December 22, 2020. Plaintiff's argument that the ARB failed to respond to the grievance, (Doc. 44, p. 2), is simply not true. The ARB responded, and their response was within the six-month window recommended by the Administrative Code. Plaintiff simply jumped the gun in filing suit before the ARB announced its decision on his appeal.

Plaintiff likewise acted too hastily with respect to his December 2020 grievance. That grievance was dated December 7, 2020, and the counselor received it on December 16th (*see* Doc. 36-1, p. 23). Plaintiff filed his lawsuit on December 22nd, only 15 days after he submitted his grievance and just six days after his counselor received it. While the Illinois Administrative Code does not include a suggested timeframe for the counselor to respond to the grievance, *see* ILL. ADMIN. CODE, tit. 20, § 504.810 (2017), it is quite evident

that Plaintiff did not give the counselor a reasonable amount of time.[6] Six days, or even 15 days, is not enough time for an inmate to conclude the counselor is not going to respond and the grievance process has been rendered unavailable.

In an attempt to save his case, Plaintiff puts forth a variety of arguments as to why his failure to exhaust the August and December 2020 grievances prior to filing suit should, in essence, be excused (*see* Doc. 38, Doc. 44). However, none of Plaintiff's arguments are sufficient to survive summary judgment.

To begin, Plaintiff's argument about complying with "the spirit and intent" of the PLRA is a non-starter. For decades, the Seventh Circuit "has taken a strict compliance approach to exhaustion." *Crouch v. Brown*, 27 F.4th 1315, 1320 (7th Cir. 2022) (citing *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006)). In order to exhaust, prisoners must follow the procedures and rules that the state has established for the grievance process, completing each step in the sequential process and complying with all requirements regarding form, content, timing, etc. *Maddox v. Love*, 655 F.3d 709, 721 (7th Cir. 2011). *See also Woodford v. Ngo*, 548 U.S. 81, 93 (2006) ("[T]he PLRA exhaustion requirement requires proper exhaustion" and "[p]roper exhaustion demands compliance with . . . deadlines

---

[6] *See Jackson v. Shepherd*, 552 Fed.Appx. 591, 592 (7th Cir. 2014) (inmate failed to exhaust where he filed suit only two weeks after submitting his grievance to counselor); *Viverette v. Brooks*, No. 3:15-717-NJR-DGW, 2016 WL 4626191, at *1 (S.D. Ill. Aug. 9, 2016), *report and recommendation adopted*, 2016 WL 4616980 (S.D. Ill. Sept. 6, 2016) (inmate failed to exhaust where he filed suit only nine days after his counselor received the grievance); *Sowemimo v. Bader*, No. CIV. 08-664-JPG, 2010 WL 2803982, at *7 (S.D. Ill. May 11, 2010), *report and recommendation adopted*, 2010 WL 2803980 (S.D. Ill. July 15, 2010) (inmate failed to exhaust where he filed suit 57 days after submitting his grievance to counselor). *But see Meyer v. Wexford Health Sources*, No. 3:16-CV-173-JPG-DGW, 2017 WL 1058831, at *4 (S.D. Ill. Feb. 16, 2017), *report and recommendation adopted*, 2017 WL 1048258 (S.D. Ill. Mar. 20, 2017) (grievance process rendered unavailable when inmate did not receive a response from counselor within 60 days).

and other critical procedural rules"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002) ("To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require."). Letters to the Governor, the Director of the IDOC, or anyone else for that matter are no substitute for compliance with the formal grievance process. *Cf. Bella v. Meli*, 754 Fed. Appx. 480, 482 (7th Cir. 2019) (bypassing the grievance procedure by writing to or speaking with the security director does not satisfy the exhaustion requirement); *Pavey v. Conley*, 663 F.3d 899, 905 (7th Cir. 2011) (participating in an internal-affairs investigation is no substitute for utilizing the formal grievance process and does not satisfy the exhaustion requirement); *Twitty v. McCoskey*, 226 Fed. Appx. 594, 595 (7th Cir. 2007) (making verbal and written complaints to jail staff cannot be used as an informal substitute for complying with the formal grievance process and does not satisfy the exhaustion requirement). Thus Plaintiff's "formal complaints" to the Governor cannot serve to exhaust his claims.

To the extent that Plaintiff relies on 730 ILL. COMP. STAT. 5/3-8-8 to support his assertion that he fully exhausted his administrative remedies and/or was thwarted from doing so, his reliance is misplaced. That statute states, in pertinent part:

> (a)    The Director shall establish procedures to review the grievances of committed persons. . . . A committed person's right to file grievances shall not be restricted. . . .
>
> (c)    Such procedures shall allow committed persons to communicate grievances directly to the Director or some person designated by the Director outside of the institution or facility where the person is confined.

730 ILL. COMP. STAT. 5/3-8-8. As other judges have explained, 5/3-8-8 is an enabling

statute that requires the IDOC to establish a grievance process that meets certain requirements. *Taylor v. Caliper*, No. 08-CV-815-JPG, 2010 WL 1416133, at *2 (S.D. Ill. Apr. 2, 2010); *Cebertowicz v. Baldwin*, 2016 IL App (4th) 150289-U, 2016 WL 482452, at *3 (Ill. App. Ct. 2016) (unpublished), *appeal denied* 50 N.E.3d 1138 (Ill. 2016). This statute does not allow inmates to bypass the formal grievance process by sending letters or complaints to the Governor. *Taylor*, 2010 WL 1416133, at *2 (order adopting report and recommendation); *Taylor v. Caliper*, No. 3:08CV00815JPG-PMF, 2010 WL 1416052, at *2 (S.D. Ill. Feb. 5, 2010) (report and recommendation); *Cebertowicz*, 2016 WL 482452, at *3. Nor does it curtail officials' ability to reject a grievance for non-compliance with the rules regarding timing and content of the grievance. *See, e.g., Conyers v. Abitz*, 416 F.3d 580, 585 (7th Cir. 2005) ("a procedural shortcoming like failing to follow the prison's time deadlines amounts to a failure to exhaust . . . if prison administrators explicitly relied on that shortcoming") (citing *Ford v. Johnson,* 362 F.3d 395, 397–98 (7th Cir. 2004)); *Pozo*, 286 F.3d at 1025 (affirming the rejection of an untimely grievance). Plaintiff did not cite to any authority that might convince the Court otherwise (*see* Docs. 38, 44).

The Court turns next to Plaintiff's assertion that his medical conditions precluded him from doing more with respect to his grievances (Doc. 44, p. 3). Plaintiff did not support his assertion with any specific facts about his medical condition in the body of his brief or in the affidavit attached thereto (*see* Doc. 44, pp. 1–5, 36–39). And there is nothing in the record that even remotely suggests Plaintiff was physically incapacitated by illness to the point that he was unable to participate in the grievance process. *See Hurst v. Hantke*, 634 F.3d 409, 412 (7th Cir. 2011) (a grievance process can be rendered

unavailable to an inmate on account of physical incapacitation). In fact, the evidence suggests the exact opposite. By the first week of December, Plaintiff had recovered enough to be transferred out of the "Coronavirus unit" and back to a regular cellhouse (*see* Doc. 42-1, pp. 10–11). Plaintiff was also physically well enough to author and submit the December 7th grievance, to file his complaint in 20-cv-01357-SPM on December 22nd, to submit formal complaints to the Governor, and to submit other grievances for himself and other inmates (Doc. 38, pp. 36, 38 (grievance regarding commissary dated Dec. 14, 2020); Doc. 44, p. 14 ("Formal Complaint/Request for Investigation" to governor dated Jan. 14, 2021);   Doc. 44, p. 27–29 (grievance that Plaintiff wrote for inmate Tony Rogers dated Feb. 15, 2021)). If Plaintiff was capable of those things, then the Court has no reason to believe he was not also capable of simply waiting for a counselor to respond to his December 7th grievance and for the ARB to respond to his August 7th grievance. Plaintiff's reliance on a bare conclusion regarding his medical condition is simply not sufficient to create a genuinely debatable issue of fact as to whether administrate remedies were available to him and trigger the need for an evidentiary hearing.[7]

---

[7] *Smallwood v. Williams*, 59 F.4th 306, 318 (7th Cir. 2023) (explaining district court is only obligated to conduct a *Pavey* hearing if the plaintiff points to "sufficient factual allegations demonstrating a genuine dispute as to whether the administrative remedies were available to him.") (citing *Roberts v. Neal*, 745 F.3d 232, 234 (7th Cir. 2014)). *See also Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) ("The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts. The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive a summary judgment motion; there must be evidence on which the jury could reasonably find in favor of the nonmoving party."); *Szymanski v. Rite-Way Lawn Maint. Co.*, 231 F.3d 360, 364 (7th Cir. 2000) ("[A] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion."). *But see Kaba v. Stepp*, 458 F.3d 678, 681 (7th Cir. 2006) ("Sworn affidavits, particularly those that are detailed, specific, and based on personal knowledge are "competent evidence to rebut [a] motion for summary judgment.") (quoting *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir.2004) (*per curiam* )); *Lynch v. Corizon, Inc.*, 764 Fed. Appx. 552, 554 (7th Cir. 2019) (holding prisoner's affidavit, which cited to events based on personal knowledge, was sufficient evidence to create a question as to whether

That leaves Plaintiff's assertions that he submitted grievances that went unanswered. In his first response brief (to Wexford's motion for summary judgment), Plaintiff made the bald assertion that "[t]here has been many instances where I didn't get a response from a formal grievances [sic] and appeal" (Doc. 38, p. 6). He did not provide any further information about the purported grievances or appeal in the body of his brief or in the affidavit attached thereto (*see* Doc. 38, pp. 1–8, 18–21). In his second response brief (to the IDOC Defendants' motion for summary judgment), Plaintiff provided a bit more information, albeit still vague and equivocal. He claimed that he submitted two grievances and one or two appeals to the ARB, and he "believe[s]" it was sometime in April and/or May of 2020, but he did not receive responses (Doc. 44, pp. 3, 4, 37). He further claimed that a counselor told him that "everything was shut down because of covid." (Doc. 44, pp. 4, 37). While he did not specify what these grievances or appeals were about (*see* Docs. 38, 44), one of his affidavits seems to suggest that they were about prison officials continuing to run lines with hundreds of inmates thereby ignoring warnings and information about how to protect inmates from COVID (Doc. 44, p. 37).

Even if the Court accepts as true Plaintiff's assertions that some grievances went unanswered, and the grievance process was shut down during the early months of the pandemic, these assertions do not establish an issue of fact as to whether the process was unavailable when it came to grieving the issues that form the basis of his claims in this lawsuit. To begin with, any grievances purportedly filed in the spring of 2020 pre-dated

---

administrative remedies were available to him, and the court was obligated to conduct an evidentiary hearing to resolve this fact dispute).

some, if not all, of the conduct at issue here. The failure to provide Plaintiff with medical care when he had COVID did not occur until Plaintiff contracted COVID in mid-November 2020. Therefore, a grievance filed in April or May of that year obviously did not include any complaints about a failure to provide medical care that had yet to occur. As for the cell transfers, Plaintiff did not specify in his complaint, summary judgment briefs, or affidavits when the cell transfers began; however, one of his grievances suggests that he was not moved until sometime after April and May (*see* Doc. 42-1, p. 13 (grievance dated Aug. 7, 2020, stating "A few months ago I was moved . . .")). The Court thus questions, but cannot say for sure, whether a grievance filed in April or May could have possibly included a complaint about cell transfers.

That being said, Plaintiff failed to adequately develop his argument that the purported suspension of the grievance process rendered his administrative remedies unavailable. He omitted any details about the duration of the suspension and whether it overlapped with his window to file grievances about the pertinent issues (*see* Doc. 38, Doc. 44). And the evidence demonstrates that any suspension did not preclude Plaintiff from grieving the pertinent issues. He utilized the grievance process on August 7, 2020 and December 7, 2020 to complain about cell transfers and the lack of medical care when he was sick with COVID. Officials responded to those two grievances at every level of the process. Plaintiff simply did not follow the administrative rules regarding the content of grievances and/or failed to wait for responses before he filed suit.

In sum, after taking the facts in the light most favorable to Plaintiff, the Court has determined that there are no genuine issues of material fact and no reasonable factfinder

could find that Plaintiff was prevented from exhausting his administrative remedies. Defendants met their burden of establishing that the grievance process was available to Plaintiff as a matter of law, but he failed to complete the process prior to filing suit.

<u>C</u>ONCLUSION

Plaintiff's motion for counsel (Doc. 37) is **DENIED.** The motions for summary judgment on the issue of exhaustion filed by Defendants DeeDee Brookhart, Laura Cunningham, Amber Elliot, and Wexford Health Sources, Inc. (Docs. 35, 41) are **GRANTED**. This case is dismissed without prejudice for failure to exhaust. The Clerk of Court is **DIRECTED** to enter judgment and close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED: March 1, 2024**

**s/ Mark A. Beatty**
**MARK A. BEATTY**
**United States Magistrate Judge**

<u>NOTICE</u>

Plaintiff is advised that this is a final decision ending his case in this Court. If Plaintiff wishes to contest this decision, he has two options: he can ask the undersigned to reconsider the Order or he can appeal to the Seventh Circuit.

If Plaintiff chooses to go straight to the Seventh Circuit, he must file a notice of appeal in the district court *within 30 days* from the entry of judgment. FED. R. APP. P. 4(a)(1)(A). The deadline can be extended for a short time only if Plaintiff files a motion showing excusable neglect or good cause for missing the deadline and asking for an extension of time. FED. R. APP. P. 4(a)(5)(A), (C). *See also Sherman v. Quinn*, 668 F.3d 421, 425 (7th Cir. 2012) (explaining the good cause and excusable neglect standards); *Abuelyaman v. Illinois State Univ.*, 667 F.3d 800, 807 (7th Cir. 2011) (explaining the excusable neglect standard). The current cost of filing an appeal with the Seventh Circuit is $605.00. The filing fee is due at the time the notice of appeal is filed. FED. R. APP. P. 3(e). If Plaintiff cannot afford to pay the entire filing fee up front, he must file a motion for leave to appeal *in forma pauperis* ("IFP motion") along with a recent statement for his prison trust fund account. *See* FED. R. APP. P. 24(a)(1)(C). The IFP motion must set forth the issues Plaintiff plans to present on appeal. *See* FED. R. APP. P. 24(a)(1)(C).

On the other hand, if Plaintiff wants to start with the undersigned, he can file a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e), but such a motion is not required to preserve his appellate rights. Any Rule 59(e) motion *must* be filed within twenty-eight (28) days of the entry of judgment. FED. R. CIV. P. 59(e), and the deadline *cannot* be extended. *See* FED. R. CIV. P. 6(b)(2). Any motion must also comply

with Rule 7(b)(1) and state with sufficient particularity the reason(s) that the Court should reconsider the judgment. *Talano v. Nw. Med. Faculty Found., Inc.*, 273 F.3d 757, 760 (7th Cir. 2001). *See also Elustra v. Mineo*, 595 F.3d 699, 707 (7th Cir. 2010) ("This court has held that otherwise timely skeletal motions that fail to satisfy the requirements of FED. R. CIV. P. 7(b)(1) do not postpone the 30–day period for filing a notice of appeal . . . .").

So long as the Rule 59(e) motion is in proper form and filed no later than 28 days after the judgment is entered, the 30-day clock for filing a notice of appeal will be stopped. FED. R. APP. P. 4(a)(4). The clock will start anew once the motion is ruled on. FED. R. APP. P. 4(a)(1)(A), (a)(4), (a)(4)(B)(ii). To be clear, if the Rule 59(e) motion is filed outside the 28-day deadline or "completely devoid of substance," the motion will not stop the clock for filing a notice of appeal, and the clock will expire 30 days from the entry of judgment. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014); *Talano v. Northwestern Medical Faculty Foundation, Inc.*, 273 F.3d 757, 760–61 (7th Cir. 2001); *Martinez v. Trainor*, 556 F.2d 818, 819–20 (7th Cir. 1977). Again, the deadline for filing a notice of appeal can be extended only on a written motion by Plaintiff showing excusable neglect or good cause.